Whenever you're ready. Good afternoon, Your Honor. David Suska for the Petitioners, Maureen and Matthew Molak. May it please the Court. Nearly 15 years ago, in his Talk America opinion, Justice Scalia lamented that the FCC has been, and I'm going to quote, repeatedly rebuked in its attempts to expand the Communications Act beyond its text. Well, here we are again. The declaratory ruling expanding E-rate subsidies for Wi-Fi on school buses blows past clear limits that Congress placed on the agency's authority in Section 254 of the Act. Section 254 H-2A authorizes support for classrooms, but a school bus is not a classroom, not as a matter of ordinary usage, statutory definitions, or common sense. And Section 254 H-1B speaks of schools generally rather than classrooms specifically, but that provision applies only to telecommunications carriers providing telecommunications services, and the declaratory ruling goes well beyond that. And these aren't the only limits in the law that the declaratory ruling defies. The order here is an attempt to perpetuate the COVID era Emergency Connectivity Fund. That was a billion-dollar, multi-billion-dollar program that Congress authorized to support remote learning during the pandemic, but ECF was temporary. Congress let it lapse, and while the FCC may disagree with that choice, it is not free to disregard it or to go rifling through the statutes-at-large to find some other authority that it might repurpose and reimagine to do what Congress wouldn't allow. Mr. Suska, can you help me with a threshold issue, and that's 47 U.S.C. 402 A, I believe is what it is. The argument on the other side is that this language, Part 1 in particular, blocks our judicial review. Could you help me with that argument? Yes, Your Honor. So, it's 405 A. Sorry, 405. No, but I'm glad that you started with 402 A, Judge Hagen, and I'll tell you why. So, 402 A is the provision that says all FCC orders are reviewable in the matter prescribed by the Hobbs Act. So, then you go to the Hobbs Act, and the Hobbs Act says that any party aggrieved by an agency order may petition the Circuit Court for review. Now, you come to 405 A. Now, the best reading of 405 A is the one that the D.C. Circuit has adopted repeatedly, most recently in Judge Katz's opinion in the CEI case. And what Judge Katz has explained there is that 405 A simply codifies the doctrine of administrative exhaustion as well as its recognized exceptions. Now, one of those exceptions is where asking the agency to reconsider would have been futile. That's this case. On that understanding of the provision, my clients wonder no obligation to ask the agency to undo what it did when it had already rejected the arguments that we're making here. Now, Judge Cassis did say, now they held what they held, but he did note that their interpretation or their reading, quote, is inconsistent with the statute's plain language, unquote. So . . . Judge Willett, I'll spot you that this understanding doesn't jump off the page, but let me explain to you why it's the right one. So I would start actually with the Supreme Court's decision earlier this year in Harrell versus Department of Defense. And why would I start there? Because that case also involved this sort of . . . a similar provision that governed judicial review of agency action. And the Court explained there that many of these provisions, Congress enacts a lot of them into the law, they use mandatory language. But to use the court used, these provisions are rarely as strict as they seem. And why is that? It's because Congress enacts these provisions against the backdrop of judicial decisions applying them and creating equitable exceptions to them. So 405A has to be understood as codifying this practice of administrative exhaustion that came with a futility exception. The government pushes back on this and says, well, if that's really how you understand 405A, then you're what I'll call or what the parties call 405A1 surplusage. But that's just . . . that's not right. For starters, the FCC has been making that argument to the D.C. Circuit for 30 years and it's consistently rejected it. But in any event, the government is misunderstanding our position on 405A1. So it's not that we're reading that out of the statute or we're saying the court should ignore it. It just doesn't apply here. So what 405A1 is doing is telling a non-party to the agency proceedings how to become a party for purposes of Hobbs Act review. This is why I was so glad that you started with 402A, Judge Duncan. I think when you read 405A in peri materia with 402, which directs you to the Hobbs Act, and with the Hobbs Act, which talks about a party degree, you understand what 405A1 is doing. It's calling back to that party participation requirement. So remind me, give me kind of the lineup. So you've got Judge Katsas and the D.C. Circuit who interpret it this way, 405A. Who's on the other side? There is no case that the government has pointed to that has dismissed a petition for review under 405A. There's the D.C. Circuit and there's nobody. Now, the D.C. Circuit is not infallible, right, and nor is Judge Katsas, even But I think that's a pretty good indication that this precedent has been sustained over 30 plus years and the FCC's continue to make this argument that it's not the right one. This is just a codification of that administrative law doctrine that comes with exceptions. But it wasn't just Katsas. I mean, he's citing to a 1985 decision by Wright and Wald. That's correct. And I think that Judge Silberman wrote one of these decisions along the way. Absolutely. Now, even if you're sort of looking at 405A1, you're still sort of puzzled on the surplusage argument that the government's making. Let me go back to explaining why I think that's not a problem here. It's not surplusage. It's just not applicable. And again, it's because when read in peri materia with 402A in the Hobbs Act, it's telling you how to become a party for purposes of Hobbs Act review if you were not previously by filing a petition for reconsideration. But of course, this court has an ultra-virus exception to the Hobbs Act's participation requirement. So we did not need to become parties to the agency proceedings. So 405A1 just drops out in this case. Now, the agency also raised standing as a threshold obstacle to review. And since that goes to the court's subject matter jurisdiction, I'll spend a couple of minutes on that. So petitioners have standing because the declaratory ruling costs them money and because setting it aside will spare them those costs. Did it cost them money? Well, so our claim here, you're right, Your Honor, our claim is that this is going to cause future injury. And now the agency comes back and says, well, you can't tell us what month's phone bill will be affected by this. But that's misunderstanding the imminence component of Article III standing. Imminence is not about how soon or exactly when future injury will occur. It's about how likely it is to occur. If you look at cases like Susan B. Anthony lists, they're distinguishing speculative or conjectural injuries from future injuries that are fairly likely to occur. That's the standard we have to meet. And fairly likely is more than met here. So there's no problem under Article III with proceeding to the merits. And if the court would like, I'd proceed to the merits. OK. But you're just hanging your hat on imminence and future economic harm. Yes, Your Honor. The injury in fact here is pocketbook injury that's going to occur in the future as the agency racks up costs from the declaratory ruling. And by operation of law, those costs are passed on to telephone subscribers like my clients. We attached as exhibits A and B to our opening brief, cell phone bills showing that we pay this federal universal service charge line item on each of four phone lines. It's about $0.66 per month. That's about $2.50 per month. It's not fractions of a penny as the agency is claiming. Now turning to the merits, the declaratory ruling invokes two parts of Section 254 as authorizing subsidies for Wi-Fi on school buses. They are subsections H1B and H2A. And the agency says in its brief that they independently authorized what the agency did here. In fact, neither does the trick. So let me start with H2A. Subsection H2A authorizes the commission to make rules to enhance access to advanced telecommunications and information services for elementary and secondary school classrooms. Now that was a lot, but the really important part was the last word, classrooms. A school bus is not a classroom. Neither is my car that I use to drive my kids to school. That's true even if they're doing homework or studying for a test in the backseat rather than needling each other. Now the government says this is all too wooden and old-fashioned in understanding of the term classrooms. And it tells us that in today's day and age, the world is a classroom and Wi-Fi on buses is needed to meet the moment. And those are actual quotes from the declaratory ruling. And I suppose that they are fine as talking points to Congress to amend H2A to go beyond classrooms. But they are not serious arguments about how to interpret that statutory text. Now, to its credit, the government then turns to the text and says, well, H2A also speaks of support for classrooms rather than in classrooms, and maybe that makes all the difference. That makes no difference. Wi-Fi on school buses is not for classrooms any more than it is in classrooms. It is for the bus or perhaps students riding the bus, but it is not for classrooms. So that leaves H1B, the government's other candidate authority. Now, subsection H1B does two things. First, it directs telecommunications carriers to provide telecommunications services at a discounted rate. And second, it directs the FCC to reimburse those telecommunications carriers for providing those discounted services. Now, those two things do not cover the declaratory ruling. Indeed, the declaratory ruling goes beyond H1B in at least four different respects. First, the declaratory ruling makes subsidies available to any kind of company, not just telecommunications carriers. Second, it makes subsidies available for any kind of service, not just telecommunications services. Third, it makes subsidies available for equipment. But look at H1B, as long as you will, you will not find the word equipment in the statute. Fourth, the declaratory ruling provides support to schools directly through the E-rate framework. But as I just mentioned, H1B only authorizes the agency to reimburse telecommunications carriers. It does not contemplate supporting schools directly. Schools are the indirect beneficiaries. So step back. So H1B, you know, limits the FCC to providing services. Well, you tell me, does it limit them to provide services only in the physical location of the school itself, only in classrooms? Because the language says, and I'm just quoting, services to elementary schools, secondary schools, and libraries. So what is the textual argument that providing services to elementary schools, secondary schools, and libraries means only the actual physical buildings of those institutions? Judge Willett, the key limit for our argument in H1B is telecommunications carriers providing telecommunications services. I will spot the agency that H1B may allow support for schools that could extend beyond the classroom, because H1B doesn't say classroom, but it's got to be telecommunications services provided by telecommunications carriers. That doesn't include the broadband and networking equipment necessary to push Wi-Fi out on buses. How does the agency get to information services like broadband and networking equipment? By borrowing on H2A. But, you know, administrative law is a little bit like going to a restaurant and having to order from the menu. If you're going to order H2A, you've got to take all of H2A, and that brings in the statutory limit of classrooms. So H1B provides some support, H2A provides some support, but they each have their limits. And if the agency is drawing on each, it has to respect those limits. That's the problem. That's what this court explained in its Topic 1 decision from 1999. This court upheld at Chevron Step 2 the agency's initial structuring of the E-rate program. But what it did is it rejected along the way the agency's all of E-rate is authorized under H1B. It said that's not the right way to read H1B, but you know what? If we draw on H2A, there's enough ambiguity to get into Chevron Step 2, and Chevron Step 2 will defer to the agency's decision to provide telecommunications and information services like internet into schools. That's all well and good, but as soon as you draw on H2A, you run up against that classroom limitation. That's why the declaratory ruling is unlawful. If there are no further questions at this time, I'll return at rebuttal. Mr. Suska, thanks very much. Appreciate it. Now we'll hear from Ms. May representing the Federal Communications Commission. Welcome. Thank you. Good afternoon, Your Honors. Good afternoon. I'm Rachel Proctor May for the government. I'm going to start with the threshold issues that you asked about, starting with 405A. Petitioners do not even acknowledge the Supreme Court's decision in Ross v. Blake that specifically addressed statutory exhaustion provisions. Ross v. Blake says that statutory exhaustion provisions have exceptions only when Congress wants them to, and petitioners don't argue that there are any exceptions in the text of 405A. And so this is why their reliance on Harrow is unhelpful to them, because Harrow did not address Ross v. Blake. It didn't say it was abrogating Ross v. Blake. It didn't address it at all. So it was addressing the separate situation of statutory time limits. Is your position that the D.C. Circuit has, these many years, been wrong about 405A? That is our position. The D.C. Circuit initially decided this in 1985. It was a different era of statutory interpretation, and they haven't re-examined it in light of Ross v. Blake. Petitioners rely heavily on the policy argument that it is pointless to require a petition for reconsideration, but policy does support Congress's intent in the first prong of 405A. Multiple comments, even when they make the same bottom line point, they bring different evidence, they bring different arguments. The number of comments speaks to the strength of support and where it's coming from. And so if people could just sit it out and wait and bring their challenges directly to the courts, it would distort the record, both before the agency and before the court. And then to the extent that they're relying on the pointlessness, they are bringing brand new arguments that they didn't bring below, and so it's a little hard to accept that it would have been pointless for them to bring those to the agency first. Are you saying that the ultravirus arguments that are being raised here by the MOLACs are different than arguments that were raised in the administrative procedure? Correct. No one challenged the agency's authority to fund internet under 254H1B or raised any of the arguments, the four arguments that Mr. Susskind just raised. So I mean, forgive me if I forgot this, but are you also relying on subsection 2405A as a bar to our judicial review? To those specific H1B arguments, yes. Okay. So the first prong would bar the petition entirely, and then the second prong would just bar the ones that weren't raised below because the commission had no opportunity to pass on them. Okay. Moving to standing, we agree that petitioners needed to show that it is likely that bus Wi-Fi will increase some month's bill. They haven't attempted to do that, and the court can't assume that it will because they haven't disputed that. Well, I'm sorry, here, standing here at the podium, Mr. Susskind said that, suggested that bus Wi-Fi would cost 66 cents a month. That's not correct, that's the USF. I think he was saying that their portion of the fund maybe was 66 cents. Their portion of the entire $8 billion USF fund is 66 cents a month. Now bus Wi-Fi for the current funding year is $19 million, so that's about a two-tenth of a percent increase. Do you agree that consumers are contributing? I mean, so I understand that the telecommunications carriers are paying it, and they're passing along the payment to consumers. Absolutely, and that's not our argument. Right, right, no, no, I understand that, but that's just, I just want to understand how it works. They're passing it along to the consumers. Correct. And this is the universal service fund that consumers are paying, the 66 cents or whatever. Do you agree that whatever increase there is in E-rate, we're increasing it, we're expanding it to buses, Wi-Fi on buses, the increase is coming out of consumers' bills? I mean, they're funding it. The question, but your view is, I think your argument is, is that it's so small an increase that it's not actually increasing the bill. Right, they are billed in whole cents on a monthly basis, so it doesn't accumulate over time, and if bus Wi-Fi takes their portion from 66 cents to 66.1 cents, they haven't given us any explanation of how they would pay 66.1 cents, so under normal rules of rounding that absent evidence to the contrary, we should. But they are contributing to it. It sounds like an infinitesimally small amount, but they're contributing to the expansion of E-rate? If somehow that tenth of a penny makes it onto their bill. Right, the money's coming from somewhere though, right? It's not just... Right, the idea is that... You can't divide up the money into such small increments that it vanishes. It is coming from somewhere. Sure, and I do want to make sure that I get to the merits, but the idea is that it's going to be, you know, it's going to, um, when you're using rounding, sometimes it rounds up, and sometimes it rounds down. And whether it is likely that a particular consumer, right, because everybody pays different amounts, whether it's likely that a different consumer is going to get a bill that rounds up depends on facts that aren't here. We don't know what petitioners believe their share of bus Wi-Fi is. We don't know how often their provider recalculates, so how many spins of the wheel are there in order for them to round up. And we don't know if the bus Wi-Fi costs are going to continue to decline as they have been doing, and as is consistent with a service where there's an initial upfront investment of equipment and service that costs a lot less on an ongoing basis. And so at some point, if their theoretical share is in the hundreds of a cent, it's hard to see how that would ever translate into an increase on their bill. Okay. Jumping back really quick, sorry, to the Hobbs Act ultravirus issue. Yes, absolutely. So in their response to your motion for the stay, they argued that they are now parties because they filed a comment in response to the SEC's something or other for fiscal year 2025, which I noticed was recently adopted as an order by the FCC, I think last week or so. So there was no reply on your part to that response, but I just wanted to give you a chance to respond to that argument here. Sure. They have offered no authority for the idea that you can retroactively make yourself a party by commenting on a completely different order. They've made themselves a party if they would like to challenge the 2025 ESL, I'm sorry, eligible services list order that was just adopted. And this flows from the language of the Hobbs Act. The Hobbs Act speaks to a final order and a party agreed by a final order. You can't be a party agreed by a final order if you're commenting on it, if you are a party to a different order. Okay. Well, let me ask you this. I understand that the FCC has authority under H-1B to permit E-rate funding for Wi-Fi school services. And what is the limitation for telecommunication carriers? Sure. Yes, petitioners are relying on the argument that H-1B is limited to telecommunications carriers providing telecommunication services. That's not what the statute says. Congress knows how to say telecommunication services. It said so in H-1A. But in H-1B, it just said services. And the commission interpreted this looking at a number of statutory provisions in section 254. The commission interpreted this to include both telecommunications and information services. Now, but after Topek, I'm sorry, yeah, Topek 1, Congress expressly referred to funding internet under H-1B. So we know that Congress believes that the commission got it right or that is at least overwhelming textual evidence that the commission got it right. And the Topek 1 assessment of the prior version of the statute is irrelevant. Petitioners also make much of the fact that H-2A was one of the several textual provisions that the commission looked at interpreting the word services in H-1B. They argue if you bring in H-2A, you have to bring in all of H-2A. But with all due respect, that's not how statutory interpretation works. The commission was interpreting the word services. And the specific way that it was interpreting the word services in H-1B and the specific way that H-2A fit into the analysis was as follows. And I'm H-1B authorizes the commission to subsidize the discounts for any of the telecommunication carriers services designated under C-3. C-3 authorizes the commission to designate services for the purposes of subsection H. So when the commission was looking at services in H-1B and asking itself, does this mean telecommunication services, information services, or both, it said, well, we know that one of the services that one of the purposes of subsection H was providing information services. So it makes sense. It is consistent to also interpret services in H-1B to mean telecommunication services. And so the bottom line there, and I think that this is something really important to understand, is when schools purchase bus Wi-Fi from a telecommunications carrier, that is entirely authorized by section H-1B. So it's, yes, they have to purchase it from a telecommunications carrier, but they can purchase the bus Wi-Fi. And so in that sense, there is no gap-filling authority needed from H-2A for that particular set of purchases. So then moving on to H-2A, this is the provision that applies when a school is purchasing a bus Wi-Fi from a non-telecommunications carrier. And of course, the term of the hour is classrooms. As the commission found, classrooms is a term that, as schools have changed and as more and more instructional content has gone online and students need internet to do their homework, the word classroom is best interpreted to include buses that have been outfitted with Wi-Fi so that they can serve as rolling study halls. Well, why wouldn't that apply to your house? Right, because a school bus is exclusively used by the school community, and my house is not. So the petitioners make much of the idea that this is blowing the doors open to internet everywhere, but that misrepresents the order. The order concluded that bus Wi-Fi and only bus Wi-Fi, that's paragraph 14, satisfies the classroom test and anything else, any other off-campus service is going to have to independently satisfy that test. Is it the government's view that Wi-Fi on school buses is going to be used for school-related purposes? Well, exclusively isn't the test. The test is primarily for educational purposes. And I think that there is strong reason to believe that it will be used by students for homework. Probably not 100% of students. Evidently not Judge Willett's children. They walk to school. Okay, I take your point. So first of all, the content is filtered. Any E-rate funded computer has to have filters on it. Now, it doesn't require social media to be filtered, but many schools do. And this was a decision that was made in 2011. The commission hasn't yet revisited that. That is what it is. But many schools do, as a practical matter, filter social media. They also filter games and other entertainment content. And then the second reason to believe that this is going to serve an educational purpose is that the schools that are asking for this often had already done pilot projects or were using it in a more limited sense and they offered comments that when this service is offered, kids use it. These are kids who are often traveling hours a day. And there are kids out there, perhaps not Judge Willett's, just kidding, but there are kids out there who do care about getting their homework done. And when they're on the bus for hours a day, it is an educational purpose to allow them to do that. Just making sure that there is... So, remind me again, we're talking, you're there, you're talking about H2A, and so you have to deal with the word classroom. But earlier with H1B, which is written more broadly, arguably, which just says schools, elementary schools, secondary schools, and libraries. Remind me again what the relationship is between those two subsections as it informs your argument? Because we've talked about both. Yes. There's two ways I want to answer that question. One is as a practical matter, the way that they relate to each other is two buckets. So bus Wi-Fi funded by telecommunications carriers, H2A. And then the way they relate as it relates to my argument is basically refuting their point that H2A has erased H1B. And our argument is that the commission in interpreting the word services in H1B looks to H2A only as one of several pieces of textual support for how to interpret the word services in H1B. Okay. And so that's how they relate. And I did want to say one other thing about classrooms. Even if classroom does mean a physical room in a building, the statute says enhanced access for classrooms. It doesn't say deliver services to classrooms. And again, when you need homework, you need the internet to do your homework. Services that help students do that are services for classrooms because unprepared students slow everybody down. So it's a service for classrooms because teachers don't have to choose between spending instructional time, getting students up to speed because they couldn't get their homework done, or simply not making use of the wealth of online educational technology that's out there because they know that some section of their class won't be able to use it. I would just say one final thing on the Hobbs Act Ultra V-Race. Our argument is that this is not the rare case where it would apply. There is no plain violation of a clear and mandatory prohibition. There has to be some sort of a limiting factor like that to the exception because otherwise it wouldn't be rare. In every case that is discussed, the Ultra V-Race exception under American Trucking has said it's rare. And so we would argue it doesn't apply or alternatively, we would suggest that it would make sense to wait for the Supreme Court's decision on when the exception applies and what its scope is. Okay. Ms. May, thank you very much. We appreciate your help today. Mr. Suska, welcome back. Sorry for butchering that earlier. My pronunciation was sus as the kids say. Oh, okay. You have five minutes. Thank you, Your Honor. I'd like to tick through a number of points in response. Let me start with some of the procedural matters, the threshold issues. So my friend on the other side said that Ross versus Blake holds up 405A, makes it sort of mandatory, subject to no exceptions. This is a bit question begging, and that's what Harrow explains. The question is, what did Congress codify in 405A? If it codified the doctrine of administrative exhaustion as long as well as its exceptions, then it's not sort of a judicial creation to sort of read exceptions into the rule. You're just applying the rule that Congress enacted. That's Harrow. And that's the D.C. Circuit's understanding. Let's see. The government stresses the importance of getting comments at an early enough stage that it can consider feedback in deciding what to do. Well, I agree with that, but recall how we got here. The declaratory ruling was issued without notice and comment. It was pushed through on a party-line vote without ever soliciting input from the public that was going to be footing the bill. So it's a bit precious for the agency to now stand here and say, well, we didn't have the benefit of your views, Maureen and Matthew Molak. The government pointed to H2, 405A2. Now, that's the provision that talks about the agency having a fair chance to pass on the different issues. It said, well, we never had a chance to consider the arguments that you're making here. That's not right. So first of all, the standard under cases like WorldCall and WATCH is whether the agency had a fair chance to see and address the issues. The letter from Senator Cruz and Representative Rogers and the dissenting statements of the commissioners and footnote 32 of the declaratory ruling itself show that the agency, in fact, had a chance and did consider the arguments that 254 doesn't authorize the ruling. Turning to standing, the government said our injury is infinitesimal and it's a hundredth of a cent. I heard tenth of a cent also. This is just not true. So even if you take $19 million as the cost of the program, now that's only for fiscal year 24 and it's an ongoing program. So unless the government's going to wind it down at the end of this year, those costs are going to stack. But just take $19 million, divide that by 300 million, that's approximately the population of this country. I doubt everyone in this country has a cell phone bill, but just suppose so. That's over six cents per person. We're not talking about fractions of a penny. And again, we're talking about costs that are going to stack. So this isn't sort of some de minimis financial injury that we're complaining about. Now, turning to the merits, I opened argument with a quote. I guess I'll try another quote. Quote, off-campus use of services, even if used for an educational purpose, is ineligible for E-rate support. Now I know that sounds like something you probably read in my brief, but that actually comes from the FCC and orders issued just about every year from between 1997 and 2022. So what's changed? I don't know, but the law hasn't. The government's hanging its hat really on H-1B. It's saying that H-1B goes beyond telecommunication services. It doesn't. You don't have to take my word for it though. Go read Topek 1. Topek 1 explains that that is not the right way to understand the statute. You have to draw on H-2A to get beyond telecommunication services. But in any case, even if H-1B did let you go beyond telecommunication services, there's still a mismatch with the declaratory ruling. The declaratory ruling applies to more than just carriers, telecommunications carriers, and it provides support for equipment. There's no argument for why H-1B authorizes that. Now I'd just like to sort of say in conclusion, as the court's thinking through the range of issues, but in particular the arguments under the Hobbs Act and Section 405A, the court should bear in mind the nature of the underlying proceeding and the perversity of the government's ultimate position. So again, the FCC pushed out this declaratory ruling without notice and comment on a party-line vote. It then argued that the lack of party participation means it's beyond judicial review. No matter how unlawful its actions, the agency says, there's nothing the court can do, all because the agency acted in a way that made party participation unrealistic in the first instance. And this was just the start of things to come. As we explained in our recent 28J letter, my clients filed a separate lawsuit challenging related order, and there we petitioned for reconsideration, and the agency pointed to that petition as the basis for dismissing this suit. So the agency thinks that it can block participation on the front end, block judicial review on the back end, and in the meantime push subsidies out the door. That's not how administrative law works. We respectfully ask the court to vacate the declaratory ruling. Okay. Mr. Seska, thanks very much. Ms. May, thank you. The case is under submission, and we will stand in recess until I think...